Filed 10/9/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>BRANDON JUSTIN LAMAR STEWART,<br><br>    Defendant and Appellant. | A155499<br><br>(Alameda County<br>Super. Ct. No. 16-CR-017147) |

Defendant and appellant Brandon Justin Lamar Stewart was convicted of forcible rape, digital penetration and misdemeanor battery on his cousin, Doe 1, when she was 15 and he was 19 years old. He was sentenced to 13 years in state prison. He argues he was deprived of his right to a fair trial under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) in violation of the due process and confrontation clauses of the Fourteenth and Sixth Amendments because the prosecutor withheld impeachment information pertaining to a key prosecution witness, the trial court declined to review the document in camera and the juvenile court did not provide information in its files pertaining to that witness until after the conclusion of his trial. Further, the trial court erred, Stewart argues, by denying his motion for new trial based on the evidence he received from the juvenile court after the trial ended.

We conclude the prosecutor violated *Brady* and the trial court erred in denying the defense motion for new trial on that ground.

1

## BACKGROUND

### I.

### *Procedural History*

In December 2016, the Alameda County District Attorney charged Stewart with forcible sexual penetration and attempted forcible rape of a minor 14 years or older, both committed on Jane Doe 1 in November 2016. The complaint also charged Stewart with two counts regarding Jane Doe 2, lewd acts against a child under 14, between May 25, 2012, and May 25, 2013, and lewd acts against a child of 15, between July 1, 2015, and July 31, 2015, when he was at least 10 years older than her. The complaint also alleged Stewart committed sexual acts against multiple victims as a predicate for sentence enhancements.[1]

As part of initial discovery, the prosecutor provided the defense with an investigator's notes indicating that in 2012, Doe 2 had been the victim of "288A Lewd and Lascivious Acts W/Child in 2012"; that the matter had been "investigated and Turned over to Juvenile Authority" and "Closed 11/27/12"; and that there was an Oakland Police Department (OPD) report regarding that matter. The notes further indicated that Doe 2 had told the investigator the incident occurred when she was 9 or 10 and was spending the night at her cousin's house, where she "woke up in the middle of the night" and found "a man lying down next to her," and that "the man was touching her" and "made her touch him." The notes indicated this may have been the incident

---

[1] Jane Doe 1 and Jane Doe 2 referred to Stewart's female cousins P. Doe and L. Doe, whom we will refer to as Doe 1 and Doe 2, respectively. At trial, both Doe 1 and Doe 2 were referred to by their first name and the last name of "Doe" to protect their privacy. To protect their privacy, we will refer to them as Doe 1 and Doe 2. They did not know each other and apparently were unrelated.

described in the 2012 police report. The prosecutor did not provide the defense with the police report or any information about its contents beyond what we have stated. Nor did the prosecutor inform defense counsel that the report contained potential *Brady* material.

The charges against Stewart involving Doe 2 were eliminated from the case in January 2017, when the district attorney filed a new complaint that included counts 1 and 2 as to Doe 1 only and omitted the charges as to Doe 2 and the multiple victim allegation.

The preliminary hearing commenced on February 16, 2018. Only Doe 1 testified. Stewart was held to answer on three counts involving Doe 1, following which an information was filed containing the three charges on which he was ultimately tried: forcible sexual penetration on a minor aged 14 or older (Pen. Code, § 289, subd. (a)(1)(C), count 1), forcible rape of a minor aged 14 or older (*id.*, § 261, subd. (a)(2), count 2), and sodomy of a minor aged 14 or older by use of force (*id.*, § 286, subd. (c)(2)(C)). The information also alleged that each offense was one of several committed against the same victim for purposes of a sentence enhancement under Penal Code section 667.6, subdivision (c). Stewart pled not guilty and asserted his speedy trial rights, and a no-time-waiver jury trial was set with a due date in May 2018.

On April 18, 2018, the People notified the defense of their intent to call Doe 2 as a witness under Evidence Code section 1108 based on the charging information relating to Doe 2 in the original complaint. On May 3, 2018, the case was sent out for trial, which was set to begin on May 14, 2018.

On May 8, 2018, defense counsel requested that the prosecutor provide a copy of the 2012 OPD report about Doe 2 referenced in the investigative notes produced during initial discovery. The prosecutor responded that the

3

suspect, who was not Stewart, and the victim were protected under Welfare and Institutions Code section 827 (i.e., were minors) and for that reason it could not turn over the police report. Defense counsel disagreed, and the matter was raised with the court on May 10, 2018, at the trial readiness conference. The court informed defense counsel that the People could not turn over the report and that to obtain it, defense would have to file a petition with the juvenile court under Welfare and Institutions Code section 827. Defense counsel filed such a petition on May 11, 2018.

On May 14, 2018, the case was assigned to a trial department, with trial to begin on May 15, 2018. From May until early June, the trial court heard motions in limine and a jury was selected. Among the motions were the People's motion to allow Doe 2 to testify as a propensity witness under Evidence Code section 1108 and the defense's motions to exclude any evidence offered under section 1108 and to order the prosecutor to produce all information required by *Brady, supra,* 373 U.S. 83, including exculpatory evidence and impeachment evidence for any prosecution witnesses.[2] The defense specifically requested that the court order the prosecutor to provide OPD Report 12-055315. On May 17, 2018, the court granted the People's motion to allow Doe 2 to testify under section 1108 and denied the motion to compel production of the police report, stating it could not "override" the juvenile court.

---

[2] Evidence Code section 1108 provides an exception to the general rule of Evidence Code section 1101 that evidence of a person's character, including in the form of specific instances of conduct, is inadmissible to show the person has a propensity to engage in certain behavior. Under section 1108, in a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by section 1101.

4

Counsel made opening statements to the jury on June 4, 2018. Shortly before Doe 2 testified on June 6, 2018, defense counsel informed the court she had not yet received from the juvenile court a copy of the police report regarding the allegation of abuse by Doe 2 not involving Stewart. She again requested that the trial court review the police report in the prosecutor's possession, and the court indicated it was not sure it was entitled to do that. While the trial was pending, defense counsel called the juvenile court's clerk repeatedly to seek an expedited review of Doe 2's records.

Four days after the jury issued its verdict and six weeks after Stewart had requested it from the juvenile court, that court provided defense counsel with redacted Child Protective Services (CPS) reports regarding Doe 2. One of the reports described an incident of alleged abuse of Doe 2, which had been reported in 2012. The report stated that in an interview at a Child Abuse, Listening, Interviewing, and Coordination (CALICO) center, Doe 2 had described being sexually abused by a male cousin who was a year older than her starting when she was eight or nine years old. That abuse, which also included an incident when she was 11 years old, consisted of multiple instances of oral copulation occurring about once a week, and vaginal penetration and anal sex occurring two or three times. Doe 2 told the investigator she did not resist because the cousin threatened to tell her mother and she did not want to get into trouble. She said her brother had caught her having anal sex with the cousin in the closet and had pushed the cousin off and threatened him. The CPS report indicated that the investigator concluded the allegations were unfounded because "[t]he children made conflicting reports regarding the alleged sexual abuse." Her brother (who was 10) and the male cousin (who was 12) had each accused the other of engaging in oral copulation with a seven-year-old cousin. Doe 2 (who

5

was 11) claimed the cousin had forced her to engage in the acts of oral copulation, vaginal penetration and anal penetration, but her brother reported that she had engaged in these acts with her cousin voluntarily. The cousin reported he and Doe 2 only had engaged in oral copulation twice and that both incidents had been initiated by Doe 2.

Based on the CPS report,[3] on August 21, 2018, Stewart's defense counsel moved for a new trial on the ground of discovery of new evidence and the prosecution's failure to disclose the evidence in violation of *Brady*.

The People opposed the motion. The prosecutor submitted the OPD report to the trial court with its opposition, which at its request was filed under seal. The defense was not provided a copy of that report,[4] but the prosecutor described its contents in the People's opposition to the motion. According to the opposition, the report "outlin[ed] sexual conduct by [Doe 2] and another boy [not defendant] who was one year older than her. According

---

[3] The defense did not have the OPD report and thus relied on the CPS report. It is not clear whether the juvenile court had the OPD report in its files. However, the OPD report is generally consistent with the CPS report in its description of the incidents and interviews involving Doe 2 and her cousin "D." It also indicated that Doe 2 had been interviewed at CALICO and that she had said her cousin asked her whether she wanted to engage in the activities (which she described as "humping" and "sucking" the cousin's penis) and that she had said "yes," except one instance when he had asked if "he could put his wiener in her butt" and she had said "no" but he had turned her around, pulled down her pants and did it anyway. It further indicated that she had said the incidents started when she was eight or nine years old and continued until just before Halloween 2012.

[4] The record does not reflect whether the police report was ever part of any juvenile court record or reviewed by the juvenile court in connection with the defense motion for its disclosure under Welfare and Institutions Code section 827. This court requested that the report be provided if it was part of the record on appeal. The People provided it and the parties were permitted to file supplemental briefs under seal to address its significance.

6

to the report, the sexual conduct began when [Doe 2] was approximately 8 or 9 and continued until she was 11. All of the incidents were alleged to have occurred in her home. On one occasion, [Doe 2] stated that the minor's 'wiener' touched her 'coochie.' On another, she said she orally copulated the minor. [Doe 2] noted that on two or three different occasions the minor put his penis in her butt. The minor male was interviewed and said the acts were consensual and only consisted of the oral copulation."

The trial court denied Stewart's new trial motion on the ground that it would not likely have admitted the evidence for several reasons, and thus it would not have "rendered a different result probable on retrial." Its reasoning was that "the evidence would not have been presented to the jury under [Evidence Code sections 782 and] 352 because to resolve the issue as to whether [the evidence] was consensual or nonconsensual by [Doe 2] . . . it would simply be too time consuming" and "would involve a trial within a trial." Further, "the fact that the child welfare worker ultimately concluded that the charges were unfounded" would not have been admissible because "[i]t's an inadmissible opinion."[5]

## II.

### *The Evidence at Trial*

The People called eight witnesses in their case in chief, including Doe 1, Doe 1's mother and sister, Doe 2, Doe 2's mother, OPD officers Amanda

---

[5] The trial court also suggested that it could have denied the motion because counsel arguably had not been diligent in seeking the juvenile court records, since she had received discovery referring to a police report about Doe 2's accusations of sexual misconduct against a person other than Stewart and did not seek the report "at an earlier time" and did not seek a continuance during the trial. However, the court did not "hang [its] hat on that" because it would inevitably lead to a claim of ineffective assistance of counsel.

7

Jimenez and Maritza Rivera, and Kristin Mancuso, a physician's assistant who conducted a sexual assault response team (SART) exam on Doe 1. On rebuttal, they called Brandi Macias, a sheriff's technician who monitored phone calls at the jail. For the defense, Stewart testified and called his sister Aaliyah and registered nurse Claire Nelli, who opined about the evidence of Doe 1's SART exam.

Doe 1 testified that on November 25, 2016, the day after Thanksgiving, she, her cousin, defendant Brandon Stewart, whom she'd known all her life, and his sister Aaliyah were sitting together on the couch in the living room at her home in Oakland. She was in the middle, with Stewart on one side and Aaliyah on the other. Doe 1 was 15 years old at the time. Aaliyah had stayed overnight at her house for the week of Thanksgiving. Her family and Stewart's family had shared a meal the night before, on Thanksgiving. She and Aaliyah were watching a movie together on her phone sharing ear buds, while Stewart was on his phone.

Stewart began rubbing Doe 1's thigh, and she moved his hand and moved away from him on the couch. At some point, Aaliyah got up to use the bathroom, saying she'd be "back in 10." The door to the bathroom was broken and off the hinges and did not allow complete privacy. While Aaliyah was in the bathroom, Stewart started rubbing Doe 1's thigh again, and she scooted over again. He said, "come on, [Doe 1]," and she said, "stop." He kept saying "come on, [Doe 1]," and tried to put his hand on her vagina. He tried to pull her pajama bottoms down, and she was trying to pull them up. Her underwear was getting pulled down with her pants. As they struggled over the pants, he put his fingers inside her vagina. He moved them inside her while keeping his eye on the bathroom door for what felt like about two minutes. She grabbed his wrist and tried to pull his hand away from her and

8

whispered to him to stop, but he kept putting his hand back inside her. After about two minutes, he took his hand out. In the meanwhile, he took his penis out of his boxers, and she felt his penis behind her, between her anus and her vagina. She felt his penis go into her vagina. It was in there for what seemed like "a long time" or "for a minute or two" and he was "trying to force it all the way in." She tried to push him off and "scoot up." She whispered to him to stop, but he kept on saying "come on, [Doe 1]." Her vagina hurt when he put his fingers and penis in it. After he pulled his penis out, he attempted to force it in her butt and its tip went in. He was moving back and forth, and her butt was "kind of hurting." She thought he was trying to put his penis in her vagina. When he stopped trying to put it in her vagina, she pushed away from him and went to her sister's bedroom. She was pulling her pants up as she went. Aaliyah was still in the bathroom.

Stewart got off the couch, followed Doe 1 and stood in the doorway smacking his lips and saying, "come on, [Doe 1]." Aaliyah could be heard trying to move the door and come out of the bathroom, and Stewart went back to the living room.

Doe 1 testified that she did not initially tell her mother or sister about the incident because she was afraid of how they might react and whether they would believe her. Stewart's younger sister had accused him of molesting her years earlier when she was about four years old, her family had not believed her, and she had been beaten because of it. Doe 1 was also concerned that her mother would tell her stepdad and brother, who were overprotective of her and would probably do something to Stewart.

When Doe 1's parents came home, her father noticed something was wrong and asked her about it, but she said she was OK because she didn't want him to know about what happened. That night, she took a very long

9

shower because she "felt kind of dirty."  She slept on the floor of her sister's room that night.  The next day, she went with Stewart, Aaliyah and their mom to visit Stewart and Aaliyah's aunt and cousin.

When Doe 1 returned to school the following week, she began acting out and got in trouble with her teachers.

Doe 1's mother testified that after the incident Doe 1 began taking long showers, acted "empty" and never wanted to do anything except lay in her room all the time.  Teachers called her to report Doe 1 was struggling in class, which was also unusual.  On November 30, 2018, when Doe 1 was sent home early from school, she told her mother about the sexual assault.  She was crying.  Doe 1's mother did not remember the details of what Doe 1 told her.  The next day, Doe 1's mother took Doe 1 to the hospital.

Doe 1's sister also testified that in the ensuing months Doe 1's behavior changed.  She was uncharacteristically quiet and snappy and angry, was taking long showers and "wasn't happy anymore."  Doe 1 also testified that during this period she felt more emotional, suffered from rapid mood swings and had "a lot of anxiety."  She was uncomfortable leaving home and going to school.

OPD officer Jimenez met Doe 1 at the Kaiser medical building in Oakland, interviewed her and took a statement from her.  When the discussion turned to the abuse, Doe 1 became shy and uncomfortable and had difficulty discussing the incident.  Officer Jimenez felt Doe 1 was not being completely open and didn't want to discuss certain details.  After the interview, he took Doe 1 to Highland Hospital to undergo a SART exam.

Kristin Mancuso interviewed Doe 1 and performed the SART exam.  She performed the SART exam six days after the assault.  She discovered "significant traumatic injuries" to Doe 1's genital area that were consistent

with "some type of penetration that stretched the hymen and tore it." These included erythema, or redness, on Doe 1's peri-hymenal tissue, which can indicate trauma. It also included two tears in Doe 1's hymen that had not yet healed, which meant they had happened recently.

The following day, Doe 1 went for an interview at the CALICO center, where staff trained in forensic interviews of sex assault and child abuse victims interviewed her. The interview was more detailed than the interview conducted by police.

Doe 2 testified that Stewart sexually assaulted her on two occasions. Doe 2, who did not know Doe 1, was a cousin of Stewart on her father's side. When she was younger, she had occasionally spent time at Stewart's house, and recalled being assaulted by him in a basement room of the house when she was 11 years old. After other people left the room, Stewart asked her for a "favor," specifically, to put his penis in her mouth. She said no, but he kept asking her three or four times until she agreed. He told her to sit on her knees, then unzipped his pants and put his penis in her mouth. He moved her head back and forth. At one point he reached down and touched her underneath, in her vaginal area. He touched her on top of her vagina underneath her underwear and was moving his finger.

When she tried to move away, Stewart took his penis out of her mouth, bent her over, pulled down her pants, and put his penis inside her butt hole. He was trying but she wasn't sure it went in. He then put his penis back in her mouth. She didn't want his penis in her mouth. Afterward, he zipped up his pants and left. Doe 2 felt confused, afraid and guilty, like it was half her fault. She did not tell her mom about it at the time.

About three years later, when Doe 2 was 14, Stewart assaulted her again. He was at her family's home and was on the couch while she was

11

lying down on it watching television. Everyone else in the house was asleep. Stewart went to Doe 2's bedroom and called for her. She went to her bedroom. No one else was in the bedroom besides him. He sat on her bed and asked her to sit in a chair in front of him. He asked if she remembered what she "did to him back at his house," and when she said she did, asked her to do it again. She refused and, as she then looked out the window, he reached under her shirt, inside her bra, grabbed her breast and began sucking on it. She started to cry and he stopped, asked if she was okay, said he was sorry and left the room. Again, she felt guilty.

Doe 2 didn't tell her mother about either incident until a few months after her sister died in 2016, when Doe 2 was 15. She didn't tell her mom everything that happened. She only told her family about what happened when she was 14. Weeks later, when her brother told her mom about Doe 1's allegations, her mom asked her if Stewart had done "anything else to you" and if he had asked her to suck his penis. She told her mother that he did. Her brother said Stewart had "rape[d] that girl." Her mother asked him if it was "positive" and he said it was, which Doe 2 took to mean that test results showed Stewart did it. Although she knew they were talking about Stewart, she didn't know the girl they were talking about, Doe 1.

Doe 2's mother reported what Doe 2 had told her to the police. When police interviewed Doe 2, she told them about Stewart putting his penis in her mouth but not about his putting his penis in her butt or the second time he put his penis in her mouth because the memories were still coming back to her. The first time she ever told anyone about Stewart putting his penis in her butt was when she told the deputy district attorney. She didn't tell the police or the deputy district attorney about him touching and rubbing her vagina.

Doe 2's mother testified. She said her son, who is older than Doe 2, spent time with Stewart when the two were growing up. Her son and Stewart were about the same age. One of her daughters died in front of Stewart's home in August 2016. It was the fall of 2016 when she first learned that something sexual had happened between Doe 2 and Stewart when Doe 2 was 14. Sometime after that conversation, police called her about another girl who was victimized and said they had heard about Doe 2. She then asked Doe 2 if Doe 2 had told her everything that happened. In the second conversation, Doe 2 told her about what Stewart had done to her when she was 11. Doe 2's mother never called the police about what Stewart did to Doe 2. The police called her in December. She discussed trying to arrange a time for Doe 2 to talk to them but was not able to arrange a time. Later, she learned police had talked with Doe 2 at school.

Doe 2's mother further testified that around the time police called her, Doe 1's father also called her. She also talked with Doe 1's mother. She never spoke with Doe 1.

Officer Rivera testified about her investigation of the case, including her contacts with Doe 2's mother and her interview of Doe 2.

Stewart testified in his own defense, denying he had sexually assaulted Doe 1. He remembered being at Doe 1's house and playing with his phone while she and Aaliyah watched a movie. He did not recall Aaliyah leaving to go to the bathroom. He slept there that night, and the next morning "was just a regular morning." The next day, Doe 1 went with him, his two sisters, and his mom to Latasha H.'s house. He went home that night, but Aaliyah stayed with Doe 1's family and went to Reno with them the following day. On the way back, Doe 1's family dropped Aaliyah off at his house in Sacramento,

and they described snow, which he had never seen. He first learned of Doe 1's allegations about a week later.

Stewart also denied he ever assaulted Doe 2. He had been in juvenile hall and then a group home for much of 2015, the year in which the second incident with Doe 2 allegedly occurred.

Stewart's sister, Aaliyah, testified about the night of her brother's alleged assault on Doe 1. She remembered getting up to use the bathroom at some point that evening but told police she was only gone for about two minutes. She did not recall Doe 1 being upset or taking a long shower that evening. Doe 1 said she wanted to go with Aaliyah, Stewart and the others to their Aunt Latasha's house the next day. Aaliyah did not remember anything different about Doe 1 the day after that, when they went to Reno.

Claire Nelli testified that she was a registered nurse certified to conduct SART examinations and consult on sexual assault cases. She had conducted SART exams for more than 20 years. She did not examine Doe 1 but reviewed the notes and photographs prepared by the SART examiner. She did not see any hymenal tears on the photographs, which in her opinion showed only normal irregularities. It could be difficult to capture images of such tears. She saw areas of erythema in the photographs but opined that it did not have clinical significance and could have been caused by anything or nothing at all. The blue dye in the some of the photographs should not be used on the hymen area because it gets diffused, does not uptake correctly and can produce false positives. The dark blue lines in two areas of the hymen on the photos were not significant and could have been just dye in the folds of the hymen. She could not see tears in the hymen on the other photos.

On rebuttal, Brandi Macias testified that he was a sheriff's technician who monitored jail calls at one of the Alameda County jails. He identified

14

compact discs (CDs) containing calls placed by Stewart while he was at the jail, which were further identified by Officer Rivera and played for the jury. The CD containing the calls is not included in the record on appeal, but closing arguments reflect that the People interpreted Stewart's comments in those calls as an attempt to create an alibi, specifically, to persuade his mother and others to say he was not at Doe 1's house on the date of the incident.

## III.

### *The Verdict*

After deliberating over the course of two days and making several requests for readbacks and other information, the jury returned a split verdict. It found Stewart guilty of forcible sexual penetration of a minor 14 or older, guilty of forcible rape of a minor 14 or older, not guilty of sodomy by use of force but guilty of the lesser included offense of battery.

## DISCUSSION

## I.

### Brady *Obligations*

As interpreted in *Brady*, "[t]he prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment." (*In re Miranda* (2008) 43 Cal.4th 541, 575.) " 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 710 (*Johnson*).)

"  'Evidence is "favorable" if it . . . helps the defense or hurts the prosecution, as by impeaching one of the prosecution's witnesses.'  [Citation.] 'Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' [Citations.]  Such a probability exists when the undisclosed evidence reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict."  (*In re Miranda, supra,* 43 Cal.4th at p. 575.)  "In determining whether there is a reasonable probability that disclosure of such evidence would have yielded a different outcome under *Brady,* ' "the court must consider the nondisclosure dynamically, taking into account the range of predictable impacts on trial strategy." ' " (*People v. Gaines* (2009) 46 Cal.4th 172, 184 (*Gaines*).)

"The prosecution's constitutional duty to disclose all substantial material evidence favorable to an accused 'extends to evidence which may reflect on the credibility of a material witness.  [Citation.] . . . "[S]uppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process . . . ."  [Citation.]'  [Citation.] Thus, '[w]hen the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility' may require a new trial.  (*Giglio v. United States* (1972) 405 U.S. 150, 154.)" (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1244-1245, fns. omitted.)

"The prosecution need not affirmatively suppress evidence favorable to the defense in order for there to be 'suppression' under *Brady*.  A good faith failure to disclose, irrespective of the presence of a defense request for the materials, may constitute the 'suppression' necessary to establish a *Brady* violation.  [Citation.]  Nor does the evidence necessarily have to be in the direct possession of the prosecution.  As the Supreme Court has explained,

16

'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, [citation]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to the level of importance is inescapable.' " (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1475, fn. omitted.)

In reviewing a claim that the prosecutor violated due process under *Brady*, we apply independent review to conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim. "Because the referee [hearing the matter] can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

**A. The Government Suppressed Evidence.**

Stewart contends the prosecution violated its obligations under *Brady* by withholding a police report containing impeachment evidence concerning a key prosecution witness, namely Doe 2. He acknowledges that he received the impeachment evidence, albeit in the form of a CPS report rather than the police report, from the juvenile court in response to a petition he filed under Welfare and Institutions Code section 827 (section 827). However, he did not receive the information until after the trial ended, and argues the prosecutor was required by *Brady* either to turn the report over to the defense or to provide it to the trial court for in camera review to determine whether it contained *Brady* material.

The People argue that because the prosecutor notified defense counsel of the existence of the report in initial discovery, thus allowing Stewart the

17

opportunity to petition that court under section 827 for access to any potential exculpatory or impeachment evidence concerning Doe 2, the requirements of *Brady* were satisfied. The People argue further that the trial court lacked the authority to conduct an in camera review of the juvenile records because section 827 confers exclusive authority on the juvenile court to decide whether to grant access to such records.

We do not agree entirely with either party. We do not agree with Stewart that the prosecutor was required to turn the police report over to him or that the trial court was required to review the report (or other juvenile records) in camera. Moreover, we do not agree with the People that the prosecutor's disclosure of notes reflecting the existence of a police report documenting Doe 2's allegation of sexual abuse by a party other than Stewart satisfied its *Brady* obligation simply because Stewart could have sought the report from the juvenile court. Rather, we conclude that while the prosecutor could have satisfied its obligation by informing the defense that the police report contained *Brady* material, its disclosure neither expressly nor implicitly indicated that was the case.

The parties discuss three cases that bear on a prosecutor's *Brady* obligation in the context of confidential records.

In *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 (*Ritchie*), the high court considered "whether and to what extent a State's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment right to discover favorable evidence." (*Id.* at pp. 42-43.) The defendant had been charged with committing rape and other crimes of a sexual nature on his 13-year-old daughter. (*Id.* at p. 43.) Before trial, he sought to subpoena records relating to his daughter maintained by a social services agency charged with

18

protecting minors.  The agency refused to comply, contending the records were privileged under state law.  (*Ibid*.)  The defendant made a motion in the trial court to require production of the records, contending they might contain names of favorable witnesses and other exculpatory evidence and specifically requested a medical report he believed was prepared during the investigation.  (*Id*. at p. 44.)  The trial court did not examine the entire file, relied on the agency's representation that there was no medical report and denied the defendant's motion.  (*Ibid*.)

The defendant was convicted at a trial in which his daughter was the main prosecution witness and appealed, claiming the failure to provide the records violated his rights under the confrontation and due process clauses.  (*Ritchie*, *supra*, 480 U.S. at pp. 44-45.)  After addressing its jurisdiction and rejecting the defendant's confrontation clause argument, the court turned to the due process challenge under *Brady*.  (*Ritchie,* at pp. 57-61.)  It rejected the state's argument that the defendant's *Brady* rights were trumped by the state's confidentiality requirement.  Observing that the state statute did not prohibit disclosure in all circumstances, the court declined to interpret it to preclude disclosure of information that a court determined was " 'material' to the defense of the accused."  (*Ritchie*, at p. 58.)  It affirmed the state high court's remand of the case but rejected that court's determination that the defense had a right to review all the files.  (*Id*. at pp. 58-59.)  The defendant's interest in a fair trial could be protected by requiring an in camera review by the trial court.  (*Id*. at p. 60.)

*Johnson*, *supra*, 61 Cal.4th 696*,* which the parties also discuss*,* is similar to *Ritchie* but involved confidential personnel records.  The issue in *Johnson* was whether the prosecutor satisfied *Brady* by informing the defendant there was potential *Brady* material in police department personnel

19

files regarding officers who were witnesses in the case. (*Johnson*, at pp. 706, 716.) Our high court held there was no *Brady* violation because, once having been made aware of the existence of potentially relevant officer personnel records, the defendant could have sought their disclosure by making a *Pitchess* motion.[6]

The prosecution did not have the records in its possession and would have had to file its own *Pitchess* motion to obtain them. (*Johnson*, *supra*, 61 Cal.4th at p. 705.) In holding the prosecutor's *Brady* obligation was satisfied when it disclosed the existence of the records, the court observed that "criminal defendants and the prosecution have equal ability to seek information in confidential personnel records, and . . . such defendants, who can represent their own interests at least as well as the prosecution and probably better, have the right to make a *Pitchess* motion whether or not the prosecution does so . . . ." (*Johnson*, at p. 705.)

The court held that " '[t]he prosecutor had no constitutional duty to conduct defendant's investigation for him. Because *Brady* and its progeny serve "to restrict the prosecution's ability to suppress evidence rather than to provide the accused a right to criminal discovery," the *Brady* rule does not displace the adversary system as the primary means by which truth is uncovered. [Citation.] Consequently, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." ' " (*Johnson*, *supra*, 61 Cal.4th at p. 715.) Rather, the court concluded, "permitting defendants to seek *Pitchess*

_____

[6] Under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, a criminal defendant may request a trial court to review law enforcement officers' confidential personnel records in camera and provide any exculpatory records that would otherwise be confidential. (*Johnson*, *supra*, 61 Cal.4th at p. 705.)

discovery fully protects their due process right under *Brady*, . . . to obtain discovery of potentially exculpatory information located in confidential personnel records. The prosecution need not do anything in these circumstances beyond providing to the defense any information it has regarding what the records might contain—in this case informing the defense of what the police department had informed it." (*Id.* at pp. 721-722.)

Stewart argues that under *Johnson*, the trial court here should have reviewed in camera the police report held by the prosecution, and then disclosed to the defense any *Brady* material the court uncovered. If the records here were confidential law enforcement personnel records governed by *Pitchess* and the Evidence Code provisions adopted to implement it, we would agree. (See Evid. Code, §§ 1043, 1045; *Johnson*, *supra*, 61 Cal.4th at pp. 705-706.) At issue here, however, are confidential *juvenile* records governed by the Welfare and Institutions Code. Such records are subject to a statutory procedure that is different from *Pitchess* procedures that govern the police personnel records addressed in *Johnson*.

Under section 827, responsibility for confidential juvenile files is placed on the juvenile court, not the trial court. Unlike *Pitchess* motions, section 827 permits prosecutors to inspect juvenile files without a court order (see § 827, subd. (a)(1)(B)), but neither a prosecutor nor any other person authorized to inspect without a court order is permitted to disseminate confidential information in juvenile files to a person not so authorized. (*Id.*, subd. (a)(4).) Instead, a person not listed among the categories of people who may inspect such records without a court order must petition the *juvenile court* to obtain access to them. (*Id.*, subd. (a)(3)(A); see also *id.*, subd. (a)(1)(Q).)

Applying *Johnson*'s reasoning, section 827 procedures should apply to a *Brady* request involving information contained in juvenile records. That

21

conclusion is further supported by *J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329 (*J.E.*), the third case the parties discuss, which was cited with approval in *Johnson*. (*Johnson*, *supra*, 61 Cal.4th at pp. 717-718.) The Court of Appeal in *J.E.* addressed *Brady* obligations with regard to confidential juvenile records and held it is the *juvenile court's* responsibility to conduct a *Brady* review of juvenile files.

In *J.E.*, the court addressed whether a juvenile in a delinquency case was entitled to have the juvenile court inspect in camera a prosecution witness's juvenile dependency file for *Brady* material. (*J.E.*, *supra*, 223 Cal.App.4th at p. 1332.) The juvenile court had rejected the ward's petition for in camera review, ruling the prosecutor rather than the court should review the records. (*Ibid.*) The Court of Appeal reversed, holding that "when a petitioner files a section 827 petition requesting that the court review a confidential juvenile file and provides a reasonable basis to support its claim that the file contains *Brady* exculpatory or impeachment material, the juvenile court is required to conduct an in camera review." (*Id.* at p. 1333.)

Citing cases holding *Brady* may require disclosure "even when the evidence is subject to a state privacy privilege," the appellate court observed, "[a]lthough the government's *Brady* obligations are typically placed upon the *prosecutor*, the courts have recognized that the *Brady* requirements can also be satisfied when a *trial court* conducts an in camera review of documents containing possible exculpatory or impeachment evidence." (*J.E.*, *supra*, 223 Cal.App.4th at pp. 1135-1336.) It next turned to section 827. "Entirely distinct from prosecutorial disclosure obligations, the Legislature has enacted a statutory scheme specifically governing access to juvenile records. There is a strong public policy of confidentiality of juvenile records [citation], and

section 827 et seq. set forth detailed provisions to protect this confidentiality. . . . [¶] Section 827 also contains provisions that permit unauthorized persons to directly petition the juvenile court for access to the confidential records. [Citations.] Under section 827, the juvenile court has 'exclusive authority to determine whether and to what extent to grant access to confidential juvenile records' to unauthorized persons. [Citation.] This statutory scheme reflects a legislative determination that the juvenile court has 'both the " 'sensitivity and expertise' to make decisions about access to juvenile records." ' " (*J.E.*, at p. 1337.) Ultimately, the court concluded, "the Legislature's placement of trust in the juvenile court to serve as the doorkeeper to these confidential files supports that the court should conduct a *Brady* review upon request by a petitioner." (*Id.* at p. 1338.)

*J.E.*, like *Johnson*, held that the combination of prosecutors' disclosure of the existence of *Brady* material in confidential records and the availability of statutory in camera review procedures was sufficient to satisfy the government's *Brady* obligations. Whereas the statutory *Pitchess* procedure discussed in *Johnson* entails review by the *trial court*, the section 827 procedure involved in *J.E.* requires review by the *juvenile court*. Based on these cases, we conclude the government's *Brady* obligations with respect to juvenile records are satisfied if the prosecutor informs the defendant that there is *Brady* material in the relevant files and the defense can then avail itself of juvenile court review of the relevant files under section 827 to identify and turn over to the defense any exculpatory or impeachment material.

Based on section 827, *J.E.* and other cases, we do not agree with Stewart that the *trial* court was required to conduct the *Brady* review of the OPD report regarding Doe 2. The courts have consistently interpreted

23

section 827 as conferring "exclusive authority" on juvenile courts to decide who, other than persons expressly authorized in that statute, may have access to juvenile case files. (*J.E.*, *supra*, 223 Cal.App.4th at p. 1337; *T.N.G. v. Superior Court* (1971) 4 Cal.3d 767, 778 ["the Juvenile Court Law and particularly Welfare and Institutions Code sections 625, 676, 781, and 827 establish the confidentiality of juvenile proceedings and vest the juvenile court with exclusive authority to determine the extent to which juvenile records may be released to third parties"]; *In re Elijah S.* (2005) 125 Cal.App.4th 1532, 1542; *In re Keisha T.* (2016) 38 Cal.App.4th 220, 231.) Stewart had the right to petition for in camera review and access to any exculpatory and impeachment material contained in Doe 2's juvenile files. But the statutory mechanism the Legislature provided for such review, section 827, placed responsibility on Stewart to file a petition and on the juvenile court to conduct the review.

However, while we agree with the People that they *could have* satisfied their *Brady* obligation by informing the defense of the existence of potential impeachment material in the police report, making a copy of the OPD available for the juvenile court's review, and referring Stewart to the section 827 procedure to obtain it, that is not what they *did* in this case. In *Johnson*, the prosecutor did not have possession of the police officer personnel records at issue and did not know the contents of those documents. In that case, the People satisfied their *Brady* obligation by informing the defense there *might* be *Brady* material in the testifying officers' police personnel records. Here, by contrast, as Stewart points out, "the prosecution held the report in her file that contained the impeachment material on Doe 2." The People thus knew what the police report contained, and as they admitted in

24

their opposition to the new trial motion, it contained potential impeachment material pertaining to Doe 2.

The People disclosed certain investigative notes and the existence of a police report (but not the actual report) about a prior alleged molestation of Doe 2 by someone other than Stewart, and the notes reflected that those allegations had been investigated and turned over to the Juvenile Authority, and the matter had been closed. But the People did not disclose, either directly or indirectly, that the police report (and possibly other juvenile records) contained information that could be used to impeach Doe 2 regarding her testimony about Stewart's molestation. The notes the prosecutor produced suggested the prior molestation incident was far less relevant than the police report (and the CPS reports eventually provided to Stewart) revealed, namely, that Doe 2 had made prior and possibly conflicting allegations of sexual abuse by another cousin; that she admitted having engaged in sexual acts with the cousin, who was close in age to her; that she engaged in these acts over a period of three or four years, beginning when she was eight or nine and continuing until she was 11; that these included the same acts she later accused Stewart of perpetrating; that both her brother and cousin told police she had participated willingly; and that her allegations about the earlier abuse were determined to be "unfounded."

While the People were not required to turn the police report over to the defense, and indeed may have been legally barred by section 827 from doing so without a court order (see *T.N.G. v. Superior Court*, *supra*, 4 Cal.3d at pp. 780-781 ["The police department . . . may clearly retain the information that it obtains from the youths' detention, but it must receive the permission of the juvenile court pursuant to section 827 in order to release that information to any third party, including state agencies"]; *Wescott v. County*

25

*of Yuba* (1980) 104 Cal.App.3d 103, 105-110 [party seeking such records must file a petition under section 827]), that did not absolve them of their disclosure duties. Because the People were aware of the contents of the police report and its potential value to impeach a key prosecution witness, they should have disclosed that the report *in fact* contained potential impeachment material. Without that information, the defense could not assess the usefulness of the police report. Unaware that the People's key witness had been sexually active from a young age, was accused of having been a willing participant in those acts, and had engaged with another child in the same acts she accused Stewart of perpetrating without her consent, the defense could only have speculated as to whether the records would yield exculpatory or impeaching evidence. Had defense counsel been told that the records contained potential impeachment material pertaining to Doe 2, she would have had strong motivation to obtain the records, at least once the prosecutor informed her of the intent to call Doe 2 as a witness under section 1108.

In short, as *Johnson* directs, "[t]he prosecution need not do anything in these circumstances beyond providing to the defense *any information it has regarding what the records might contain . . . .*" There, it was enough for the prosecutor to "inform[] the defense of what the police department had informed it." (*Johnson, supra*, 61 Cal.App.4th at pp. 721-722.) Here, the People should have apprised the defense, at minimum, of the fact that the OPD report contained potential impeachment material pertaining to Doe 2. Had it done so, defense counsel would have been able to make an informed decision, once it became clear that the prosecutor intended to call Doe 2 as a propensity witness and the court granted its motion to do so, whether to seek a continuance to waive Stewart's speedy trial right so as to ensure the

26

defense received the impeachment material from the juvenile court in time to use it at trial.

## B. The Suppressed Evidence Was Material.

" ' "The suppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process within the meaning of the Fourteenth Amendment." ' " (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 348.)  Here, the prosecution suppressed evidence bearing on the credibility of a key witness, namely, Doe 2.  To prevail on his *Brady* claim, Stewart must also show the information in the police report was "material" within the meaning of *Brady*.

Our Supreme Court discussed the standard for *Brady* materiality in *In re Brown* (1998) 17 Cal.4th 873 (*Brown*).  "[I]n *Kyles* [*v. Whitley* (1995) 514 U.S. 419], the court reemphasized four aspects articulated in [*United States v.*] *Bagley* [1985] 473 U.S. 667, critical to proper analysis of *Brady* error.  First, '[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).  [Citations.]  *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  [Citation.][7]

---

[7] In the context of harmless error review, the courts have held that the reasonable probability standard does not mean "more likely than not, but

"Second, 'it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.]

"Third, 'once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review.' [Citation.] The one subsumes the other. [Citation.]

"Fourth, while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively." (*Brown, supra*, 17 Cal.4th at pp. 886-887.)

Doe 2, regarding whom the evidence was suppressed, was the victim not of the charged offenses but of other offenses by Stewart that the People used to show his propensity to commit sexual offenses. To assess the materiality of the suppressed information, we will begin by assessing the importance of Doe 2's testimony at trial. We will then consider the impeachment value of the information concerning Doe 2's prior allegations of sexual abuse. Finally, we will evaluate the degree to which the denial of

---

merely a *reasonable chance*, more than an *abstract possibility*." (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1534-1535.) This standard has also been applied to motions for new trial. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519-520; *People v. Uribe, supra*, 162 Cal.App.4th at pp. 1472-1473 [new trial motion based on *Brady* violation].)

access to the impeachment information to the defense undermines our confidence in the fairness of Stewart's trial.

There is no question that the most important witness at the trial was Doe 1, the victim of the sexual molestation for which Stewart was on trial. As we have discussed, she testified about Stewart's sexual acts at length. Besides her testimony, there was corroborating evidence, including her mother's and sister's testimony about the changes in her affect and behavior after the incident, a nurse's testimony that a SART exam showed tears and redness in her hymen that were consistent with the assault Doe 1 described and, as we will further discuss, Doe 2's testimony about Stewart's sexual abuse perpetrated on her.

Doe 1's credibility was challenged to some degree by the defense because of discrepancies between Doe 1's statements at various times (her statements to her mother, a police officer, the SART examiner and the forensic interviewer, and her testimony at the preliminary hearing and at trial). The cross-examination also focused on her failure to yell or run away or kick Stewart during the alleged assault, her return to the living room to sit next to him later that evening, her choice to spend the following day with Stewart and his family, and her failure to tell anyone about the assault promptly after it occurred. The defense also drew attention to Doe 1's testimony during the preliminary hearing and statements to others that she had "blacked out" during the incident.

After cross-examination, a juror asked the court how the jury should handle inconsistencies between the preliminary hearing transcript and Doe 1's trial testimony and sought clarification about "the nature of

[Stewart's] penis inside [Doe 1's] vagina."[8] Another asked for clarification of Doe 1's testimony that the written statement the police officer prepared was not read to Doe 1 before she signed it. Another asked if Doe 1 had had sex before or after the incident. During deliberations, the jury requested to see a stipulation concerning Doe 1's mother's statement about Doe 1 having blacked out. It also requested a read-back of Doe 1's "statement/testimony about sodomy."

Doe 2 was probably the second most important witness.[9] Her testimony provided powerful corroboration of Doe 1's testimony by demonstrating Stewart had a propensity to sexually assault younger girls.

We have already summarized Doe 2's testimony that Stewart pressured her to orally copulate him, sodomized her, and digitally penetrated her vagina when she was 11 years old, and asked her to orally copulate him, grabbed her breasts and put his mouth on them when she was 14. Not only did the People call Doe 2, they called two additional witnesses to buttress her testimony and to address Doe 2's failure to report the incidents until years after they occurred and her failure to report some of Stewart's alleged acts until shortly before trial. Doe 2's mother testified about why she did not report Stewart's alleged abuse of Doe 2 to the police. The investigating officer, Rivera, testified about Doe 2's fearful and embarrassed demeanor during Rivera's interview of her, apparently to explain her admitted failure to report to police that on the first occasion Stewart had touched her vagina,

---

[8] The trial court apparently permitted jurors to submit questions for witnesses as they were testifying.

[9] The SART examiner's testimony was also important.

30

attempted to sodomize her and put his penis into her mouth a second time.[10] The investigator also explained why there was no forensic interview of Doe 2 regarding Stewart's alleged assaults.

Doe 2 was prominently featured in both the People's opening statement and their closing arguments. In her opening statement, the prosecutor described in some detail Doe 2's anticipated trial testimony that Stewart sexually abused her. The prosecutor's closing began with both Doe 1 and Doe 2 and ended with both of them and contained many references to Doe 2. The prosecutor began her closing this way:

"*Two girls* who harbored a shameful secret, sexual assault. *Two girls* whose words of no meant nothing to the defendant. *Two girls* who were younger and smaller than him. And, ladies and gentlemen, that is why we have been here for the past few weeks, because of these *two young girls*." (Italics added.) The prosecutor ended her rebuttal by reminding the jurors that a defendant can be convicted of a sexual assault crime "based on only one witness," but "we don't have that in this case. We have all of these other individuals and all of this other evidence to show you beyond a reasonable doubt that *not only was* [*Doe 1*] *victimized by the defendant, but so was* [*Doe 2*] *and that the defendant has propensity to commit these sex crimes*. . . . [¶] And when you're [Doe 2], the horror of all that is coming up in here and telling strangers the first time, two different sexual assaults on two different days that this defendant committed for the first time in front of a room full of strangers. . . . [¶] . . . [¶] Ladies and gentlemen, the end of all of this, this evidence, *all of the testimony that you have heard from* [*Doe 1*] *and* [*Doe 2*] *is clear,* and when you go back in that deliberation room, I am asking you to use

---

[10] Rivera also testified that she was the investigating officer for Doe 1's case and briefly testified about the forensic interview of Doe 1.

31

each piece of evidence from the 923 form to [*Doe 2's*] *uncharged acts showing the defendant's propensity to commit sex crimes* to the other witnesses who corroborate the circumstantial evidence, to [Doe 1's] own words, and put all of that together in a respectful way so that you can look at each of these verdict forms as to Count One, Count Two and Count Three and you deliver verdicts of guilty based on all the evidence." (Italics added.)[11]

In short, Doe 2 was a key witness for the prosecution. Not surprisingly, jurors asked a number of questions about her during the trial, such as, "Is any investigation being carried on [Doe 2's] case independent of [Doe 1's] case?" and, "When did [Doe 2] first report her sexual encounter with the defendant[?]" During deliberations, the jury requested a copy of a stipulation about Doe 2's recount of events and asked, "When was the first mention of sodomy by [Doe 2] (to her mom/police/DA etc.)?"

Turning to the suppressed information about Doe 2, its potential impeachment value to the defense, or lack thereof, is a critical aspect of materiality. As we have already explained, the CPS report and the police report outlined sexual conduct between Doe 2 and a cousin other than Stewart who was a year older than her (referred to as "Cousin D"). The sexual acts began when she was eight or nine years old and continued at least until she was 11. It included acts that were the same or similar to those she accused Stewart of having committed when she was 11, namely oral copulation, vaginal penetration and sodomy. Similar to her allegations regarding Stewart, she told the investigator she had not resisted Cousin D's

---

[11] The jury was given a propensity evidence instruction that if it found by a preponderance of the evidence that Stewart forcibly orally copulated and sexually battered Doe 2, it could conclude that he was disposed to commit sexual offenses and was likely to commit and did commit the charged offenses.

sexual abuse (in his case because he had threatened to tell her mother). She also said her brother had caught her engaging in sexual acts with Cousin D twice. Her brother and Cousin D told the investigator that Doe 2 was a willing participant, and Cousin D admitted only to oral copulation. Doe 2's allegations about Cousin D were reported and investigated in 2012, and the matter was then closed. The description she provided the investigator referred to in the OPD and CPS reports was entirely different from a report contained in the investigator notes the prosecution had produced to the defense, involving an adult stranger who she woke up to find in her bed while staying at another cousin's house.

Stewart argues this suppressed information would have provided "fertile areas" for impeachment of Doe 2. In particular, he contends, defense counsel could have used the timing and content of the reporting about Cousin D to suggest Doe 2 had "confabulated the incidents with [Stewart] after hearing the allegations made by [Doe 1] because it triggered her own unresolved trauma." "She stated she did not tell the police the entire story because 'memories were still coming back to me' at the time of her interview in December of 2016. What memories were coming back to her? Were they those with cousin 'D' or [Stewart]?" The acts Doe 2 accused Stewart of committing were very similar to those she had reported regarding Cousin D, namely, oral copulation, vaginal penetration and sodomy.

This evidence could have been particularly powerful because Doe 2 or her mother reported the incidents with Cousin D in 2012, when Doe 2 was 11 years old, which was her age at the time appellant allegedly induced her to orally copulate him, rubbed her vagina with his fingers and put his penis in her "butt." Yet neither she nor her mother reported Stewart's alleged abuse in 2012 or at all, until four years later, and only after they heard about

Doe 1's allegations. Further, even when she did report it in 2016, she reported oral copulation, but not vaginal touching or sodomy. She testified she did not report the entire story to police "[b]ecause the memories were still coming back to [her]." The defense could have argued, with some force, that Doe 2 and her mother did not report the alleged abuse by Stewart—even though, near in time to when she said he first abused her, they reported similar abuse by Cousin D—because the alleged abuse by Stewart never happened. The defense could have suggested she was either confusing one cousin with the other or not being truthful. Jurors might have been inclined to question Doe 2's memory or credibility, given the degree of similarity between her claims of abuse by Stewart and those she had made earlier about her other cousin.[12] The same is true of the fact that Doe 2's reports of abuse by Stewart were made belatedly and had evolved and expanded over time.

At oral argument, defense counsel suggested an additional way Stewart's trial counsel could have used for impeachment purposes the conflict between Doe 2's 2012 claims of ongoing abuse by Cousin D and her 2016 report to police. In 2016, the only sexual abuse Doe 2 initially reported to

---

[12] The similarities extended beyond the acts Doe 2 accused Cousin D and Stewart of committing (oral copulation, vaginal penetration and sodomy) to details about the incidents. For example, Doe 2 testified that Stewart told her to sit on her knees and then put his penis in her mouth. Notes attached to the police report state that in her forensic interview Doe 2 stated, as to one of the incidents with Cousin D, that Cousin D told her to "get on your knees" before putting his penis in her mouth. At trial she also testified that when she was 11, after she orally copulated him, Stewart "bent me over and pulled [her] pants down" and "put his penis inside of [her] butt hole." The notes of her forensic interview indicate she said that after she refused Cousin D's demand that she "let me put my wiener in your butt," Cousin D "turned [her] around, pulled [her] pants down, [and] put [his] penis in her butt."

34

police by anyone other than Stewart involved a stranger at her cousin Jeremy's house,[13] and this account "differed significantly" from her 2012 report of molestation by Cousin D, who she alleged committed acts "remarkably similar" to those she alleged against Stewart. These two previous claims made by Doe 2 could have affected her credibility if defense counsel had elicited from her that the stranger incident was something she fabricated rather than revealing the incidents with Cousin D. Alternatively, if she omitted to tell police in 2016 about the latter incidents, the defense could have suggested she was dishonest. Or finally, if she had testified that all three allegations of abuse, against the stranger, cousin D and Stewart, had in fact occurred, the defense could have argued she had a pattern of making such allegations and that none of them were credible.

Yet another way in which the defense could have used the suppressed evidence to challenge Doe 2's credibility concerns her testimony implying she had not previously experienced sexual activity. For example, when asked "how did the area of your vagina feel as that was happening?" she responded, "I was new to it, so it felt weird." Yet the suppressed CPS report indicates she accused Cousin D of vaginal penetration on multiple occasions. She testified that when Stewart's penis was in her mouth during the first incident, she felt "kind of confused and afraid." She "didn't know what was going on" "[be]cause at that age I didn't know anything about stuff like that." She testified that when defendant asked her to orally copulate him again when she was 14 and she told him "no," she felt "scared," and when he sucked

---

[13] This description of the prior event is the one the People gave to the defense prior to trial. In their motion to admit Doe 2's testimony under Evidence Code section 1108, the People described Doe 2's alleged prior abuse as involving an unknown man who asked her to touch his penis while she was spending the night at her cousin's house.

35

on her breast, she "started to cry." Yet, according to the CPS report and OPD report, she had previously reported orally copulating Cousin D on several occasions and being caught by her brother doing so. The defense could have used the evidence of her prior sexual activity, coupled with the evidence that she engaged in it with Cousin D voluntarily,[14] to suggest she was being less than truthful in portraying herself as "new to" sexual activity and "confused and afraid."

We do not mean to suggest by the foregoing discussion that Doe 2 was untruthful at trial. It is not within the scope of our role as an appellate court to assess witness credibility, and we do not do so here. Our point is simply that the juvenile records pertaining to Doe 2 that the prosecutor suppressed and that the defense received only after the trial concluded could have been used by the defense to raise questions about her credibility.

The People characterize Doe 2 as a "collateral witness" and argue that even if the jury had found her not credible, Stewart's "guilt was . . . firmly established by other evidence." We cannot agree. Certainly, the evidence, even without Doe 2, would have been *sufficient* to sustain the verdict. But that is not the test. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." (*In re Brown*, *supra*, 17 Cal.4th at p. 887.) Doe 1's testimony along with other evidence at trial was not so strong that rational jurors could not have found reasonable doubt. Further, the People argued in their motion to admit Doe 2's testimony that her testimony was "powerful evidence of [Stewart's] propensity to commit sexual crimes against the victim[] in this case" and "highly relevant in

---

[14] The police report included a statement from Doe 2's younger female cousin stating that she saw Doe 2 kissing Cousin D's stomach and penis and threatened to "tell" but that Doe 2 "said not to because he was her boyfriend."

showing that he sexually assaulted [Doe 1]." (Italics added.) And indeed it was.

If the jury had found Doe 2 not credible and rejected her testimony altogether, it would have had to rely on Doe 1's testimony and the other, weaker, corroborating evidence alone. To be sure, that evidence was sufficient to support the conviction, but that is not the relevant question. Rather, the question is whether in the absence of the suppressed impeachment evidence, Stewart received a fair trial, that is, a trial resulting in a verdict worthy of confidence.

We cannot say that he did. Propensity evidence was excluded for three centuries under the common law "not because it has no appreciable probative value, *but because it has too much*." (*People v. Alcala* (1984) 36 Cal.3d 604, 631.) In 1995, the Legislature adopted Evidence Code section 1108, abrogating the common law rule with respect to sex offenses, because such offenses are "usually committed in seclusion without third party witnesses or substantial corroborating evidence." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911, 915.) While defendant moved in limine to exclude Doe 2's testimony in the trial court, defendant does not here challenge the trial court's decision to admit that testimony. He does challenge the suppression of impeachment evidence that could have undermined the credibility of Doe 2's otherwise powerful propensity testimony. In our view, the suppression of that evidence compromised the fairness of defendant's trial to a degree that undermines confidence in the result.

## II.

### *The Trial Court Erred in Denying Stewart's Motion for New Trial.*

Stewart's motion for new trial was made on two grounds, the statutory ground of newly discovered evidence and the non-statutory ground that the

37

prosecution violated his rights under *Brady*.[15]  For reasons we shall discuss, we conclude that the trial court erred in denying the motion for new trial based on the People's improper suppression of *Brady* material and therefore need not reach the newly discovered evidence ground.

The trial court denied the motion for new trial that Stewart filed after he received the CPS reports on the ground that the evidence was not material.  It would not have "rendered a different result probable on retrial," the court reasoned, because the limited exceptions for admission of past sexual acts evidence set forth in Evidence Code sections 1103, subdivision (c)(1) (evidence of past sexual conduct by complainant offered to prove consent in juvenile sex crime prosecution) and 782 (evidence of past sexual conduct by complainant or section 1108 witness offered to challenge credibility) were subject to the balancing test of Evidence Code section 352.  The court's assessment under section 352 was that "to resolve the issue as to whether [Stewart's sexual acts] [were] consensual or nonconsensual by [Doe 2] . . . would simply be too time consuming.  It would involve a trial within a trial."  With respect to section 782, it reasoned that while the defense might argue "that the evidence showed . . . a character trait on the part of [Doe 2]—to falsely claim unconsensual sexual conduct," the "credibility exception to [Evidence Code section] 782 must be narrowly exercised" and the presentation of such evidence would have been "too time consuming."

---

[15] We have considered the merits of Stewart's claim that the trial court erred in denying his new trial motion based on his *Brady* argument even though it was a nonstatutory ground for his motion.  (See *People v. Fosselman* (1983) 33 Cal.3d 572, 582 [declining to read Penal Code section 1181 "to limit the constitutional duty of trial courts to ensure that defendants be accorded due process of law" and entertaining motion on nonstatutory ground].)

We do not agree that the defense could have been barred from using the suppressed information to impeach Doe 2 on these grounds. As to the time-consuming rationale, the court allowed the prosecution to conduct what amounted to a mini-trial when it admitted Doe 2's testimony under Evidence Code section 1108, calling Doe 2 herself, her mother and a police officer, the latter two to bolster Doe 2's credibility; the jury was instructed on the use of that propensity evidence; and the prosecutor spent a significant part of her opening statement and closing argument discussing Doe 2. In this circumstance, it would have been an abuse of discretion to prevent Stewart from using the excluded evidence to cross-examine Doe 2. While a trial court has discretion to balance between the probative value of evidence and the danger of prejudice, confusion and undue consumption of time, " '[t]his balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty.' [Citation.] Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense." (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.)

As to the trial court's second rationale concerning any attempt to prove Stewart's conduct as to Doe 2 was consensual, the defense did not claim it would have used the evidence to show Doe 2's acts were consensual. Rather, it claimed it would have used the information to challenge her credibility. And again, while the trial court stated it would have barred use of the evidence to challenge Doe 2's credibility because it would have been "too time consuming," to have done so would have been an abuse of discretion. Where prior claims of sexual abuse are directly relevant to the credibility of the complaining witness, or in this instance, a propensity witness whose testimony was central to the trial, a defendant's right to a fair trial requires

that he be allowed to use evidence relevant to that witness's credibility to impeach him or her.  Any undue consumption of time could have been avoided by limiting the time devoted to such cross-examination to a degree commensurate with the witness's direct examination and the relevance of the impeachment testimony.  This can be accomplished under the procedure set forth in Evidence Code section 782 under which a defendant makes an offer of proof and shows the relevancy of the sexual conduct and the court holds a hearing outside the presence of the jury at which the complaining witness may be questioned.  (Evid. Code, § 782, subd. (a); see *People v. Daggett* (1990) 225 Cal.App.3d 751, 757 [trial court erred in failing to hold hearing to determine whether prior molestations were sufficiently similar to acts of which defendant was accused to be relevant to the credibility of complaining witness].)

The prosecutor made this case about "*two* girls," Doe 1 and Doe 2, and a trial focused on Doe 1 alone would have been a very different trial.  For this and all the other reasons we have discussed in evaluating Stewart's *Brady* claim, we have concluded that if the OPD report and CPS reports had been available to the defense, there was a reasonable chance the jury would have reached a different result; that is to say, the suppressed evidence would have "put the whole case in such a different light as to undermine confidence in the verdict." (*In re Miranda*, *supra*, 43 Cal.4th at p. 575.)  The same is true with respect to a new trial—a more favorable result would be reasonably probable on a retrial if this evidence had been available.  The trial court thus erred by denying defendant's motion for new trial made on the basis of the *Brady* violation.

## DISPOSITION

The judgment is reversed, and the case is remanded for further proceedings.

_____

STEWART, J.

WE CONCUR:


_____

KLINE, P. J.


_____

RICHMAN, J.


*People v. Stewart* (A155499)

42

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Allan D. Hymer

Counsel for Appellant: Marylou Hillberg, by Court-Appointment under the First District Appellate Project Independent Case System

Counsel for Respondent: Xavier Becerra, Attorney General; Lance E. Winters, Chief Assistant Attorney General; Jeffrey M. Laurence, Assistant Attorney General; Eric D. Share, Alisha M. Carlile, Deputy Attorneys General